CASES DETERMINED

# COURTS OF APPEALS

AT THE

MARCH TERM, 1910.

---

MARY W. ANDERSON, Respondent, v. MEYER BROTHERS DRUG COMPANY, Appellant.

### St. Louis Court of Appeals, May 17, 1910.

1. **RELEASES: Validity: Negligence in Signing.** The plaintiff in a personal injury action, who executed a release, under the impression it was merely a receipt for a payment made on account of loss of time, is not barred because of the failure of her mother, who was standing near her at the time she executed the release, to detect the effect of it; but the plaintiff in such a case is barred by her own failure to use ordinary care to obtain information, by making inquiry concerning the contents of the release or having her mother read it, unless the effect of such failure is broken by some other fact sufficient to excuse her behavior, such as fraud on the part of defendant or mental incapacity on the part of plaintiff.

2. ——: ——: **Fraud.** In an action for injuries from poison mixed with a harmless drug sold to plaintiff by a druggist, where a release was pleaded in bar in the answer and the reply attacked the release on the alleged ground it had been obtained through fraud, the fact that an attorney of defendant wholesale drug company said to plaintiff's father to sign a paper for the druggist who sold plaintiff the drug, which had been purchased by the druggist from the defendant company, the paper being a release of liability of defendant and the druggist, did not show fraud as to plaintiff, where the request of the attorney was not shown to have been communicated to her, although she signed the release under the impression it was a receipt for loss of time, which the druggist had previously agreed to pay.

(554) [149 App.

3. ———: ———: ———: Evidence Held Insufficient to Establish. In an action for personal injuries, evidence *held* insufficient to show the execution of a release was induced on the assurance or statement that it was a mere receipt for money paid on account of loss of time.

4. ———: ———: Mental Capacity: Evidence Held Not to Establish Incapacity. In an action for personal injuries, evidence *held* to show that plaintiff when she signed a release was not in such a stupid condition that she was unable to understand the nature and purpose of the instrument if it had been read to her.

5. ———: Contracts: Rescission: Mutual Mistake: Misrepresentations. If both parties to an instrument execute it under a mutual mistake as to its terms, or if one is led into the mistake by the fraudulent, or perhaps the innocent, misrepresentations of the other, or by trick or artifice, the instrument may be set aside in equity.

6. ———: Rescission: Action at Law: Pleading. Under section 654, Revised Statutes 1899, where a release is set up as a defense in an action at law, the matter relied on to avoid it may be pleaded in the reply.

7. ———: ———: Unilateral Mistake. While a release may be avoided for a mistake as to a past or present fact material to the agreement, a unilateral mistake, unmixed with fraud or duress, is not ground for avoidance.

8. ———: Contracts: Validity: Duty of Signer. A person is expected to learn what an instrument contains before he signs it, either by reading it or having it read, or by having its contents stated by some one on whom he has a right to rely, provided either method of obtaining information is available without too great inconvenience; and if such a precaution is not taken, when it can be, and no deceit or artifice is practiced to mislead the signer, usually he will be held bound by the obligation of the writing.

9. ———: ———: ———: ———: Effect of Hurrying. And these rules have been followed in cases where the signer was in a hurry when he signed and for that reason omitted to use the means to post himself which otherwise he would have used, and even where he was hurried by the other party.

10. ———: Validity: Inadequacy of Consideration. Though gross inadequacy of consideration is treated as a circumstance to show fraud in a transaction, and when so egregious as to shock the conscience, has been regarded as sufficient evidence of fraud to warrant the setting aside of a transaction wherein property was transferred, unless there was counter evidence

to disprove the fraud, no such decision has been found where the instrument attacked was a release of damages suffered for a tort, and, besides, where the evidence proves conclusively a fraud was not perpetrated, and mistake and not fraud is relied on for relief against the release, the release will not be set aside on the ground of inadequacy of consideration.

11. ———: ———: **Release Held Valid.** In an action for personal injuries, it is *held* that no artifice, misrepresentation, duress or other fact sufficient in law to invalidate the release was in proof, and, therefore, it must be upheld as a discharge of defendant's liability and a bar to plaintiff's action.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale,* Judge.

REVERSED.

*Watts, Williams & Dines* and *William R. Gentry* for appellant.

The demurrer to the evidence should have been sustained. (a) Because there was no negligence on the part of the defendant shown by the evidence in this case. (b) Because the plaintiff admitted that she signed the release pleaded in bar of the plaintiff's action and received the consideration, and did not prove, as she alleged, that her signature thereto was obtained by fraud or misrepresentation of any kind. She having signed it, and having admitted that she signed it under circumstances when she had the opportunity to find out its contents, but when she neglected to do so, she is bound by it just the same as if she had read it. She attempts to excuse herself for not reading it on two grounds: first, that she was hurried by her father; second, that her eyesight was in such condition that she could not read the release herself. Neither of these excuses can avail her anything because her mother was present and in the enjoyment of all her faculties, she not having taken any of the poison, and could have read the release to plaintiff, and the plaintiff admits that if it had been read to her she could have understood it.

Plaintiff is bound by the release she signed under those circumstances. Steffen v. Supreme Assembly of Defenders, 130 Wis. 485; Deering et al. v. Hoeft, 111 Wis. 339; Albrecht v. Railroad, 87 Wis. 105; Sanger et al. v. Dun et al., 47 Wis. 615; Leddy v. Barner, 139 Mass. 349; Rosenberg v. Doe, 146 Mass. 191; McNamara v. Electric Ry., 83 N. E. 878; Grace v. Adams et al., 100 Mass. 505; Straker v. Ins. Co., 101 Wis. 413; Powder Co. v. Railroad, 101 Mo. App. 442; McFadden v. Railroad, 92 Mo. 343; Kellerman v. Railroad, 136 Mo. 136; Railroad v. Cleary, 77 Mo. 634; O'Bryan v. Kinney, 74 Mo. 125; Patterson v. Railroad, 56 Mo. App. 657; Nenno v. Railroad, 105 Mo. App. 540; 8 Current Law, p. 1718; Osborne v. Railroad, 98 S. W. 685; Railroad v. Van Ordstrand, 67 Kan. 386; Fuller v. Ins. Co., 36 Wis. 599; Hicks v. Harbison-Walker Co., 212 Pa. St. 437; Heck v. Railroad, 147 Fed. 775; Railroad v. Belliwith, 83 Fed. 437; Snider v. Express Co., 63 Mo. 376; Brown v. Fagan, 71 Mo. 563; Bennett v. Lumber Co., 110 Mo. App. 699; Mateer v. Railroad, 105 Mo. 320; Mathias v. Stock Yards Co., 185 Mo. 459; Railroad v. Green, 114 Fed. 676; Hendricks v. Vivion, 118 Mo. App. 417; Johnston v. Life Ins. Co., 93 Mo. App. 580; Catterlin v. Lusk, 98 Mo. App. 182; Bradford et al. v. Wright, 123 S. W. 108; Breeders Co. v. Wright, 134 Mo. App. 717; s. c. 122 S. W. 1105; Manufacturing Co. v. Carle, 116 Mo. App. 581; Bank v. Hall, 129 Mo. App. 286.

*Thomas B. Harvey* and *Hazen I. Sawyer* for respondent.

GOODE, J.—This plaintiff is the daughter of John and Mary Anderson and at the time of the events to be narrated, lived with her parents in their home in Keokuk, Iowa, of which city they had been residents for many years, and through all plaintiff's life. Her father was chief of the fire department of the city and the home of the family was above the engine room of said

department. A block and a half away was the drug store of McGrath Brothers, of whom the Anderson family were friends and customers. Plaintiff and her sister Georgia Anderson were employed by a telephone company to work at its switchboard in Keokuk. A cousin of plaintiff named Herbert Anderson, who resided in Decatur, Illinois, not far away, was visiting the family on December 3, 1905, and some members of it being indisposed, he was sent by Mrs. Anderson to the McGrath drug store to purchase licorice powder, a remedy the Andersons were in the habit of using for slight ailments. McGrath Brothers had purchased recently ten pounds of the remedy from defendant, a wholesale drug concern doing business in the city of St. Louis, and had emptied it into a dawer in their store in which they had always kept licorice powder and nothing else. A small portion of the powder in that drawer was sold and delivered to Herbert Anderson, who took it to Mrs. Anderson, and on the same night she gave her husband two teaspoonfuls and one teaspoonful to each of her daughters. Those three persons were seized with a violent illness shortly afterward and came near dying. For the purposes of this appeal we need not enumerate the symptoms from which plaintiff suffered, further than to say they were extremely distressing and painful, affected her eyesight and nervous system and the consequences of the poisoning had continued to the date of the trial in May, 1909, more than three years after the medicine was taken. The physician called to see the patients found they were suffering from belladonna poisoning and it turned out leaves of the belladonna plant had been in some unexplained way mixed with the licorice powder. It is in proof that belladonna contains atropin, hyoscymine and hyoscin, all of which are poisonous. There was abundant, if not conclusive, evidence to establish that plaintiff, her father and her sister were made dangerously ill and narrowly escaped death by the effect of the doses of medicine they took, and that the pernicious

result was due to a poisonous ingredient having been carelessly mixed with the licorice powder. The remedy when properly prepared is mild and harmless, so the physicians testified, and contains no belladonna. The powder sold by defendant to McGrath Brothers was analyzed by a St. Louis chemist and found to contain belladonna, but the import of the testimony of experts is that the quantity of the belladonna was insufficient to produce so violent an illness as plaintiff and the other members of her family experienced. By January 11, 1906, plaintiff was able to go back to the telephone office and did go back that day, though she was still suffering from the poison. The firm of McGrath Brothers was much concerned about the catastrophe and one of them had said to Mrs. Anderson a night or two after the accident, in the presence of her husband and in the room where her daughters were sick in bed, she "need not worry a thing about this. I will see that your daughters get paid for the time they lose and the doctors all get paid. You need not worry a bit;" to which remark Mr. and Mrs. Anderson answered "All right, sir." Mr. Anderson gave this testimony regarding information about defendant's connection with the medicine: "We told Mr. McGrath (meaning John McGrath) we did not intend to have anything against him on account of the licorice powder." He was asked if he told said McGrath anything about Meyer Brothers Drug Company and answered: "No, sir; he told us about them . . . the next day after we took the poison." Asked if the intention then was to make a claim against said Drug Company, he answered: "Not at that time; we had not decided to do anything;" said they had not yet consulted an attorney and probably did not for a year later. The witness also testified he had told Thomas McGrath, in answer to an inquiry by the latter, propounded about a week after the poison had been taken, the girls were paying five or six dollars a week for substitutes to work in their places in the telephone office, and he said that

was not enough (meaning not enough compensation to the sick girls for their time) and he would make it ten dollars and would pay the doctors' bills—"would see that everything was paid." These promises of McGrath were repeated by Mr. Anderson to his wife and daughters. An attorney was sent by defendant from St. Louis to Keokuk and said attorney employed an attorney in Keokuk named Hollingsworth. On January 11th, Hollingsworth went with Thomas McGrath to the engine house and held a conversation with Anderson, Hollingsworth saying he wanted Anderson to sign a paper he (Hollingsworth) produced, for McGrath Brothers, without explaining further what it was and Anderson took it without asking what it was or learning its contents. Nothing was said in that conversation about what the Anderson girls had been earning or had paid for substitutes. McGrath said nothing then and neither he nor Hollingsworth mentioned the amounts stipulated in the paper to be paid the Andersons, or said the paper was merely a receipt for ten dollars paid each of the girls for their lost time and expenses. Hollingsworth only asked Anderson to sign the paper for the McGraths and Anderson said he did not feel like signing it then. Hollingsworth said he wanted the girls to sign it and was told they were away at work, but would be home at five o'clock. The further evidence for plaintiff on the issue of the execution of the paper was, in substance, about as follows: Though plaintiff was able to go to the telephone office January 11th, she was still quite ill and when she returned home in the afternoon was suffering in some degree from the poison; was "in a sort of a daze," and her vision was so blurred she could not read, but was able to understand what was said or read to her. She signed the paper in the kitchen of her family home above the engine house, without reading it or hearing it read by any one. Her father, mother and sister were all present at the time and no one else was present. Plaintiff attempted to read the paper but could

not; her father brought the paper up and did not give plaintiff time to read it. Her mother could read, was an educated woman and perfectly familiar with the English language, but plaintiff never asked her to read the paper and she (the mother) did not have time to read it. Her father came upstairs with the paper in his hand and handed it to her, telling her to sign it. She and her sister Georgia both objected to signing it, but her father insisted and her mother signed his name for him, then told plaintiff where to sign, saying: "Sign right here," pointing. Plaintiff could see her mother's hand. Her father brought the paper and did not allow time to read it and no one stated to plaintiff the contents or character of the paper; she "naturally supposed it was for our substitutes." The objections of plaintiff, her mother and sister were stated three times, but as often her father told her to sign and to hurry as a man was waiting downstairs for the paper. Plaintiff did not know the paper contained a release of demands against defendant and never had heard of defendant company in connection with the poisoning. She understood she was signing a receipt for ten dollars for money to pay the substitute to take her place in the telephone office and understood the money had come from McGrath Brothers. "Neither her mother nor any one else told witness what was in the paper." She subsequently received this money through her mother, still supposing it was from McGrath Brothers and not knowing anything about defendant. The testimony of John Anderson as to what occurred between him and Hollingsworth and McGrath anterior to the release having been signed has been given in part, but there is more of it. He said he spent only two minutes upstairs with his family getting it signed; knew Hollingsworth had been attorney for the McGraths; when Hollingworth and McGrath were told in the first interview about four p. m. January 11, the girls would be at home at five o'clock,

149 App.—36

they left and Hollingsworth returned at five and then asked Anderson to get the girls to sign the paper. Meanwhile, though the girls were at home, Anderson had not seen them. Anderson said he did not read the paper because his eyesight was so affected by the poison he could not and Hollingsworth made no statement of the contents of the paper and witness asked nothing about the contents. He was asked if the girls would sign it and said he did not know; there were firemen standing near who could read, but Anderson asked none of them to read it and instead took it upstairs where his wife and daughters were in the kitchen. He did. not take the trouble to let his wife read the paper to see what was in it; when he asked plaintiff to sign it she said: "Papa, I don't want to sign it; I don't know what is in that paper." His daughter Georgia said about the same. Mrs. Anderson was listening to the conversation. Neither asked to have the paper read. After the three signatures had been affixed, witness took the paper downstairs and delivered it to Hollingsworth who went away with it, remarking: "I will have the money in a few days." Anderson testified he signed the receipt because he supposed it was a receipt for ten dollars. He testified further as follows:

"Q. Do you mean to tell us that Mr. Hollingsworth did not say anything else in that conversation about this paper except that he wanted you to sign that paper for McGrath Bros.? A. Yes, sir, I do.

"Q. That is your positive statement? A. Yes, sir.

"Q. You asked no questions as to what was in the paper? A. No, sir.

"Q. Although you did not know anything about the contents of it? A. No, sir.

"Q. You did not know anything whether it was a release, a receipt, an assignment of wages or a promissory note? A. Only what he told me. I asked him what it was and he said that it was a paper for McGrath Bros.

"Q. When he told you that he gave you no intimation of the contents of it? A. No, sir.

"Q. Do you mean to tell us that you went and urged your daughters to sign a paper that you did not know anything about? A. I mean that I took in the paper that Mr. McGrath sent over for them girls to sign for their money. to pay these here substitutes.

"Q. Did Mr. McGrath say anything to you about signing the paper the day before that? A. No, sir.

"Q. Why did you think it was for McGrath? A. Because Mr. Hollingsworth brought that paper and said it was for Mr. McGrath.

"Q. You have given all the conversation that occurred on the subject of that paper? A. Yes, sir, as far as I know.

"Q. And all that ever was said in your presence and hearing? A. Yes, sir, as far as I know or remember."

It is not clear whether that testimony related to the first meeting of Anderson, Hollingsworth and John McGrath on January 11 at four o'clock, or to the second meeting at five o'clock. Mrs. Anderson testified to being present when the release was signed and to signing her husband's name. She said: "Mr. Anderson brought the paper upstairs and said 'here is a paper from McGrath. Sign my name to it.'" She was then asked: "Who did he say that to?" and answered, "to me, and I said, 'I wouldn't sign that paper,' and he said, 'hurry up, the man is waiting; sign my name,' so I signed it." She did not read the paper and no one read it in her presence, and no one said what it contained; she was educated and could read without difficulty; did not have time to read because her husband was hurrying her; he used no violence to compel her to sign and she feared none; it took only a few minutes; Mary (plaintiff) was complaining at the time "of just being prostrated, almost;" that plaintiff knew at the time she signed the paper of McGrath's promise to pay for loss of time and

doctors' bills. On March 1, 1908, and after the date (September 20, 1907) of the filing of this action, plaintiff tendered $82 to defendant which was refused and at the trial said sum and $11 more for interest from January 11, 1906 was tendered and refused. The evidence showed plaintiff did not sue defendant nor employ an attorney until she learned, nearly two years after the date of the release, another woman in Keokuk who had taken the poisoned powder had brought and settled an action for damages, when plaintiff "employed counsel and undertook to break this release." Georgia Anderson said her father gave them no intimation of the contents of the paper and she had no idea what it was when she signed it; were not more than a couple of minutes about it; "when John Anderson told witness to sign it she did not say a thing, she just signed it because her father told her to sign it; did not say that she did not want to sign that paper; is positive that she did not say that; she just signed the paper; did not know what was in it; her father did not tell her; he never told her mother nor her sister Mary in her presence what was in it; he never gave any intimation of its contents; witness had no idea what the contents of the paper were that she signed; nobody said to witness or to her sister Mary in her presence and hearing that the paper they were asked to sign was merely a receipt for ten dollars voluntarily offered and paid to witness or her sister or either of them, by Meyer Bros. Drug Company in part consideration for the time they had lost from their employment and the expenses incurred by reason of any injuries resulting from taking the licorice powder into their systems; nobody told them anything about it; there was never anything said at all about that; they were expecting some sort of paper to be sent there to be signed; Mr. McGrath had told them that it would not cost them a cent, that they should not worry about it; he said that he would pay for their time and pay the doc-

tors' bills; that was just a few days after they had taken the licorice powder and that was when McGrath came to see how they all had been getting along." When asked what she understood the paper was for, she answered: "Well, Mr. McGrath told us we wouldn't be out a cent, and when papa came up he told us to sign. While witness was laid up she had to employ a substitute, her sister Mary had to do the same while she was laid up. At the time of the signing of the release plaintiff, witness, their mother and their father were present. Has heard of Mr. Hollingsworth but does not know him by sight. No one explained what the contents of the paper were." Hollingsworth testified that on the first visit to see Anderson, when he was accompanied by McGrath, all the circumstances of the illness of the family, their sufferings, doctors' bills and loss of time were recounted by Anderson, who knew a settlement in full was being considered and was informed by witness Meyer Bros. Drug Company had sold to McGrath the licorice powder which caused the illness and the Drug Company had employed witness to make a reasonable settlement of it; witness took no paper with him on either the four or the five o'clock visit, but Anderson came to his office about six o'clock and said he had talked with the family about signing a release for damages and they had all decided to sign it; then took from Hollingsworth the duplicate releases and the next day brought them back to his office duly signed and was given the draft of defendant company for twenty dollars. The duplicate release reads:

"Received from the Meyer Bros. Drug Company $82 in full settlement of any and all damges, present or future, incurred by reason of the sale to me by McGrath Bros. of compound licorice powder on or about December, 1905, or any ill-effects caused by taking of said powder, hereby fully releasing every one responsible therefor, including especially Meyer Bros. Drug Company

and McGrath Bros.    Keokuk Iowa, January 11,
1906.
(Signed)⟨            "JOHN ANDERSON,
                "MARY ANDERSON,
                "GEORGIA ANDERSON."

We show the contents of the draft for twenty dollars drawn on defendant by its St. Louis attorney to settle with the Andersons.

"$20.00            Keokuk Iowa, January 11, 1906.
            "KEOKUK NATIONAL BANK.

"At sight pay to the order of John Anderson, with exchange Twenty and no |100 Dollars. Value received and charge the same to the account of John C. Vaughan.

"To Meyer Bros. Drug Co., St. Louis, Missouri."

On the back are the following endorsements:

"John Anderson.

"Pay to the order of the National Bank of Commerce, of St. Louis, Missouri, State Central Savings Bank, of Keokuk, Iowa, George E. Ricks, Cashier."

"Received payment January 16th, 1906. J. A. Lewis, Cashier."

There are also in evidence two drafts of thirty-one dollars drawn on defendant to pay the doctor who attended the Andersons.

The petition in the present action charges defendant with having negligently caused and permitted a large quantity of deadly poison, to-wit, belladonna, to become mingled with a powder designated and represented by defendant to be licorice powder; that defendant carelessly sold and delivered to McGrath Bros. a quantity of said licorice powder so mingled with the poison, when defendant knew, or should have known, McGrath Bros. were engaged in selling drugs in the city of Keokuk and would be likely to sell to the general public such licorice powder; that defendant in selling and delivering said powder to McGrath Bros. carelessly represented to them the powder was pure in character and

free from poisons and other substances dangerous to human life; that the medicine designated as licorice powder when properly compounded is harmless and may be taken into the stomach and system with safety; alleges further McGrath Bros. relying on the representations made by defendant with reference to the powder, and believing them to be true, represented the licorice powder was harmless and sold and delivered to plaintiff a quantity to be used; that afterwards plaintiff took some of the said powder into her stomach and system and as a direct result of the powder being mixed with poison, became "poisoned and violently sick, her general health was greatly and permanently injured, she has suffered and will permanently continue to suffer great pain of body and anxiety of mind."

In the answer, the release instrument is pleaded in bar of plaintiff's case along with a general denial of the averments of the petition. The answer says plaintiff, on or about January 11, 1906, for a valuable consideration, to her in hand paid by defendant, did fully and forever release and discharge defendant from all liability for damages, present and future, incurred by reason of the sale to McGrath Brothers of compound licorice powder on or about December 31, 1905, and from any ill effects caused from taking any of said powder. In her replication plaintiff alleges the release was fraudulently and wrongfully obtained, was not valid, but void, and should be held for naught for the following reasons:

"Plaintiff states that said instrument of writing and alleged release was prepared and caused to be prepared by the defendant company ready to be signed and executed, and was brought and presented to plaintiff under the representations to and belief by her that it was merely a receipt for ten ($10) dollars, voluntarily offered and to be paid to her by McGrath Brothers, from whom the licorice powder had been bought, as a return to her of the amount she had to pay a substitute

to work in plaintiff's stead while she was disabled by reason of the injuries resulting to her from the taking of said licorice powder into her system, and plaintiff further states that said instrument of writing was not read to her or by her nor were the contents thereof known to her before or at the time of signing the same, and that her eyesight was at the time so impaired and weakened by the effects of the poisonous powder which had been sold to her and which she had taken as alleged in her petition, that she was unable to read said instrument; and that while she was yet suffering from said poison, mentally and physically, plaintiff signed said instrument under the belief that it was merely a receipt for ten ($10) dollars, to be gratuitously paid her for the purpose aforesaid, and without any knowl-edge that it was a writing designed to take away from her her right or cause of action against the defendant company.

"Plaintiff further said that said alleged instrument of writing in the nature of a release was obtained from her by the defendant company without any consideration whatsoever for the same."

We believe the foregoing statement of the evidence is complete in substance, especially the portion bearing upon the validity of the release; and just here we will remark that we find in neither abstract the following language said in plaintiff's brief to have been uttered by Anderson to his daughters when he went upstairs with the document: "Hurry up and sign this paper for McGrath; the man is waiting downstairs for it." Neither do we find testimony to support the statement in the brief that the father was "assuring them the paper was for McGrath and with parental authority (was) ordering them to hurry up and sign it." There is ample evidence to prove plaintiff signed the release under the impression she was executing a receipt to McGrath Brothers for ten dollars to pay the substitute hired to take her place in the telephone office, and did not know

she was releasing defendant from a claim for damages. What we say is we have found no trace of evidence that anything was said or done by plaintiff's father or other person at the time she appended her signature, reasonably adapted to induce her to believe she was signing merely a receipt to McGrath Brothers. She testified she "naturally supposed it was for our substitutes." Her father said to her mother it was a paper for McGrath, as in truth it was, but he did not say it was only a receipt to McGrath or pretend to state its contents, and if plaintiff is to be believed, she knew nothing of its contents. If she was under a mistake about the terms of the instrument, the mistake arose not from what occurred then, but from a previous occurrence; the promise of the McGraths made shortly after the poison was taken, to pay plaintiff and her sister for the time they would lose from their employment and pay the doctors who waited on them. Repeated perusals of the record have failed to reveal that Anderson made any representation as to the contents of the paper when he took it upstairs to be signed, and in truth, the evidence is unbroken that he did not. In submitting the issue of the validity of the release to the jury, the court advised, among other things, the jury must find "her signature to said instrument was obtained upon or by a false assumption on her part that it contained simply a receipt for ten dollars paid to her by McGrath Brothers; and the court further instructs the jury that before they can set aside or disregard the legal effect of said release, they must find and believe from the evidence, not only that her signature to said release was obtained by her falsely assuming that it contained simply a receipt for money paid to her by McGrath Brothers with which to pay a substitute for her who was doing the work of plaintiff while plaintiff was unable to do the same, but the jury must further find that the defendant company or its agent or representative, or some person acting for the defendant company, by some act or language or conduct, induced

the plaintiff to believe that she was signing a receipt to McGrath Brothers for money paid by McGrath Brothers to her for the purpose aforesaid; and unless you find that the defendant or its agent or some one acting in its behalf said something or did something that misled the plaintiff or deceived the plaintiff, into signing the paper shown in evidence and spoken of as a 'release' your verdict must be for the defendant, notwithstanding you may also find and believe from the evidence that the amount paid the plaintiff by the defendant was unfair and wholly insufficient to compensate the plaintiff for her alleged injuries." Where, we ask, is the evidence that defendant, or any agent of it, allowing for the sake of argument Mr. Anderson acted as its agent in procuring the release, said or did something which misled plaintiff, or deceived her into signing the paper shown in evidence, or by act or conduct induced her to believe she was signing a receipt to McGrath Brothers? If the father was ever the agent of the defendant in the matter, it was only after he had been approached by Hollingsworth in the afternoon of the day the release was signed; and the record is barren of a single fact to prove he did or said anything from then on until plaintiff's signature had been affixed, to induce her to believe she was signing a receipt to McGrath Brothers. If he ever did or said anything to produce such an impression on her mind, it was before and when he repeated to her the promise of McGrath to pay for lost time and medical attention. Therefore the question stands on these facts, if the testimony for plaintiff is true: Nothing had been said to her by her father on the day in question about signing the instrument until he took it to her to be signed; what then transpired occupied from one to three minutes and his remarks consisted of ejaculations or commands for her and her sister to hurry and sign, and for his wife to sign for him, as a man was waiting downstairs for the paper. Plaintiff tried to read it but could not. The reason she could not, to be de-

duced from the testimony, was weakness of vision or being hurried, or both. Her mother was present and heard everything that transpired, was well and could read. Plaintiff testified herself she was in possession of all her faculties, knew what was said or read to her, and she testified as though she remembered everything that occurred, showing she was conscious of what was going on. She saw her mother point out the place to sign, could tell there was typewriting on the paper, and the difference between it and the blank part. She did not ask to be told its contents, though she objected to signing without knowing them; did not ask her mother to read the paper, and all three signatures were affixed without reading it or ascertaining its contents, Mrs. Anderson signing for her husband with perfect ability to read. The instrument was so short and explicit and the name of Meyer Bros. Drug Company was so conspicuously placed in the first line of the typewritten matter, that it was carelessness of the rankest kind for any one who could read to sign it without observing defendant's name and learning the instrument released it from liability. In truth such an oversight approached the impossible, we think. But plaintiff said she could not read and is not to be barred for her mother's failure to detect the effect of the writing, but only for plaintiff's own failure to use ordinary care to obtain information; that is, failure to inquire concerning the contents of the paper or have her mother, who was standing by, read it. But such conduct does bar her unless its effect is broken by some other fact sufficient to excuse her behavior, such as fraud on the part of defendant or mental incapacity on the part of plaintiff. The sole circumstances in evidence tending to show fraud is the testimony of Anderson, that Hollingsworth said to him to sign the paper for McGrath; a remark which might leave the impression it was a document in which only the McGrath Brothers were interested. But as already said, this request of Hollingsworth is not shown to have been com-

municated to plaintiff by her father; and though perhaps misleading, it was not false, because the instrument released McGrath Brothers as well as defendant. We hold plaintiff put in no evidence to prove the execution of the instrument by her was induced on the assurance or statement that it was merely a receipt for ten dollars to McGrath Brothers. We hold further that plaintiff herself refuted the statement of the replication that her mind was in such a stupid condition at the time she was not able to understand and comprehend the nature and purpose of the instrument if it had been read by her mother to her. The learned judge who tried the case rightly refrained from submitting the issue as to plaintiff's mental capacity. The extent of the evidence on this matter is that she felt very weak when she returned from work. But her weakness was not of the mind, and she was so well aware what was asked her as to protest several times against signing the paper without knowing its contents, and the incidents of the occasion show those concerned had full possession of their faculties. It is hard to understand why plaintiff and the others objected to signing without knowledge of the contents of the document, yet made no use of convenient means to learn. But waiving the inconsistency of plaintiff's objecting on the score of ignorance of what the writing was, when, as she says, she thought she knew it was a receipt to McGrath Brothers, we remark that in our opinion the best light in which the case can be thrown for plaintiff is this: She was under the impression, owing to previous circumstances, the paper was such a receipt, and laboring under the mistake, signed without exercising more caution, because of her father's haste. The proposition is advanced that a party who signs a contract when under a mistake about its terms or legal effect, is not liable on it; but we know of no such rule of law, nor has any authority been cited which so holds. If both parties to an instrument execute it under a mutual mistake as to its terms, or if one is led into the mis-

take by the fraudulent, or perhaps the innocent, misrepresentation of the other, or by trick or artifice, the instrument may be set aside in equity; and if it is of the kind in hand and is relied on in defense of an action at law, the matter relied on to avoid it may be pleaded in reply to the answer. [R. S. 1889, sec. 654.] Neither an innocent nor a fraudulent misrepresentation was proved in the case at bar; for no statement was made to plaintiff about the terms or effect of the instrument, and the haste of her father would not create a mistake in her mind. A treatise cited for plaintiff on the point in hand says, in substance, a release may be avoided for a mistake as to a past or present fact material to the agreement, but a unilateral mistake, unmixed with fraud or duress, is not ground for avoidance. [34 Cyc. 1058.] Cases in which releases of liability for torts have been attacked, when pleaded in bar of an action for damages, are numerous in the reports, and in practically all of them it was contended the releases were executed by the plaintiffs under a mistake as to their terms and effect. If plaintiff's position is sound, those instruments would be held invalid uniformly, instead of being sustained as most of them are—in truth all which did not appear to have been procured by fraud, misrepresentation, duress, or while the plaintiff was disqualified mentally to make a contract. [Mateer v. Railroad, 105 Mo. 320, 16 S. W. 839; Homuth v. Railroad, 129 Mo. 629, 31 S. W. 903; Crim v. Crim, 162 Mo. 544, 63 S. W. 489; Layson v. Cooper, 174 Mo. 211, 73 S. W. 472; Albrecht v. Railroad, 87 Wis. 105; Deering v. Hoeft, 111 Wis. 334; Rosenberger v. Doe, 146 Mass. 191.] It is trite law that a person is expected to learn what an instrument contains before he signs it, either by reading or having it read, or by having its contents stated by some one on whom he has a right to rely, the circumstances considered, and provided either method of obtaining the information is available without too great inconvenience. If such a precaution is not taken, when it can

be, and no deceit or artifice is practiced to mislead the signer, then usually he will be held bound by the obligation of the writing. [Snider v. Express Co., 63 Mo. 376, Mateer v. Railroad, Layson v. Cooper, supra; Hicks v. Harbison, 212 Pa. St. 437; Railroad v. Belliwith, 83 Fed. 437; Railroad v. Green, 114 Fed. 676; Heck v. Railroad, 147 Fed. 775; Bennett v. Lumber Co., 116 Mo. App. 669, 94 S. W. 808; Hendricks v. Vivion, 118 Mo. App. 417, 94 S. W. 318; Johnson v. Ins. Co., 93 Mo. App. 580; Bradford v. Wright, 123 S. W. 108.] Said rules have been followed, too, in cases where it appeared the signer was in a hurry when he signed and for that cause omitted to use the means to post himself which otherwise he would have used; and where he was hurried by the other party. [Mateer v. Railroad, supra; Breeders Assn. v. Wright, 134 Mo. App. 717, 115 S. W. 470; s. c. 122 S. W. 1105; Railroad v. Vanordstand, 67 Kan. 386.] In Crim v. Crim, supra, the Supreme Court abjured the doctrine that a mistake regarding the terms of a writing will defeat its validity as between the original parties, citing prior cases wherein said doctrine had been taken as the rule of decision, and saying they were not to be followed; saying, further, that to permit a party when sued on a written contract to admit he signed it, but deny it expressed the agreement he made, or to admit he signed it, but did not read its stipulations, would destroy the value of all contracts and negotiable instruments; that the purpose of rejecting such evidence is to give stability to written agreements, and remove the temptation to perjury, which would be afforded if parol testimony was admissible. We are cited in plaintiff's brief to cases said to hold the contrary; but on reading them we find the ground on which the contracts were annulled was either artifice practiced to obtain them, or that the parties attacking them were unable to contract on account of feebleness of mind, or could not read either because of illiteracy, blindness or weakness, and no one was near whom they could ask

to read to them. These are some of the cases. [Lusted v. Railroad, 71 Wis. 391; Railroad v. Harris, 158 U. S. 326; Robertson v. Const. Co., 115 Mo. App. 456, 92 S. W. 130; Railroad v. Huffstutler, 50 So. Rep. 146.]

Counsel for plaintiff point to the inadequacy of the consideration paid by defendant for release from liability in comparison with the damages to which plaintiff was entitled; and no doubt there is a great disproportion, for she was allowed nothing for her sufferings, but only for her time and bills of physicians. Counsel have not cited, nor have we found, an authority for the proposition that the smallness of the sum paid by a tortfeasor in settlement of a claim for damages due to his tort is, in itself, cause for annulling the release. Gross inadequacy of consideration is treated as a circumstance to show fraud in a transaction, and when so egregious as to shock the conscience, has been regarded as sufficient evidence of fraud to warrant a decree setting aside a transaction wherein property was transferred, unless there was counter evidence to disprove the fraud. No such decision has been found where the instrument attacked was a release of damages suffered for a tort. Anyhow, the evidence before us proves conclusively a fraud was not perpetrated, and, in truth, mistake and not fraud is relied on for relief against the release. No artifice, misrepresentation, duress or other fact which suffices in law to invalidate that contract is in proof, and, therefore, it must be upheld as a discharge of defendant's liability and a bar to plaintiff's action.

The judgment is reversed. All concur.