## JAMES REDDICK, Respondent, v. UNION ELECTRIC LIGHT AND POWER COMPANY, a corporation, Appellant.

St. Louis Court of Appeals. Opinion Filed June 24, 1922.

1. **RELEASES: Fraud and Deceit: Fraudulent Procurement of Release: Evidence: Sufficiency.** In an action for damages for personal injuries, *held* that there was substantial evidence to show that a release executed by plaintiff was procured by fraud.

2. **CONTRACTS: Written Instruments: Negligence in Failing to Read: Presumptions: Contradiction by Parol Evidence: Fraud and Deceit.** Where a party is *sui juris,* in possession of his faculties, is able to and has full opportunity to read the instrument which he signs, and executes it without fraud practiced upon him, the law presumes that he knew its contents, and he will not be permitted to take advantage of his own fault or negligence or say that the instrument did not express the real contract.

3. **RELEASES: Fraud and Deceit: Ignorance: Signer's Negligence in Failing to Have Release Read: Estoppel: Evidence: Question for the Jury.** Whether plaintiff, an ignorant and illiterate man, who could neither read nor write, was negligent in failing to have someone read a release of his claim for damages for personal injuries before signing it when presented by defendant's foreman, a former fellow employee, on the public street, while no one else on whom he could rely was near, and whether such foreman fraudulently represented that the release was a receipt for a pay check, *held* a question for the jury.

4. **——: ——: Allegations of Fraud in Procurement of Release: Evidence: Variance.** In an action for damages for personal injuries in which defendant pleaded the execution of a release by plaintiff, plaintiff's testimony that he had no money coming to him for work

done when he received a check for which he executed the release, but which he testified he was told was for full time while in the hospital, that he did not state that such settlement would be all right with him and that he was told he was signing a receipt for his pay check, *held* that there was no variance between the allegations of fraud in plaintiff's reply to the effect that defendant's agent represented such check to be in payment for straight time while in the hospital and the release a receipt therefor, and the evidence.

Appeal from the Circuit Court of the City of St. Louis.— *Hon. Victor H. Falkenhainer,* Judge.

REVERSED AND REMANDED.

*Jourdan, Rassieur & Pierce* for appellant.

(1) The court erred in refusing to direct a verdict for the defendant. (a) Because there was no substantial evidence that the release was procured by fraud. (b) Because plaintiff was guilty of negligence in failing to exercise ordinary care in relying upon the alleged false representation in the procurement of the release and in failing to exercise ordinary care to ascertain the contents of the release before he signed the same. Hall v. Kansas City S. Ry. Co., 209 S. W. 582; Carroll v. United Rys. Co., 157 App. 247, 269. (2) The court erred in giving instruction No. 2 at the request of plaintiff. (a) Because this instruction authorized the jury to set aside the release without a finding that in the exercise of reasonable prudence plaintiff had a right to rely upon the alleged false representation in its procurement and without a finding that plaintiff exercise ordinary care to ascertain the contents of the release before he signed it. Hall v. Kansas City S. Ry. Co., 209 S. W. 582; Carroll v. United Rys. Co., 157 App. 247, 269. (b) Because it authorized the jury to avoid the release upon a finding that defendant falsely represented that the release was a receipt for wages, which alleged false representation was nowhere sustained by the evidence. Plaintiff admitted that he knew he had no wages coming and he would have

no right to rely upon a statement he knew was false.   (c) Because the instruction assumes that plaintiff had a cause of action, and that defendant was liable thereon t' plaintiff if the release in question were void.   (d)   An instruction which assumes an issuable fact to be true is erroneous.   Wease v. Tool Co., 187 Mo. App. 716, 719; Ganey v. Kansas City, 259 Mo. 654; Lynn v. Massillon Bridge Co., 78 Mo. App. 111; Dority v. Railroad, 188 Mo. App. 365, 375. (3)   The court erred in refusing to give instruction No. D as requested by defendant.   (a)   Because the law is settled that plaintiff had to show that he exercised reasonable care in ascertaining the contents of the release before signing it, before he had a right to set it aside on the ground of fraudulent representations as to its contents.   Hall v. Kansas City S. Ry. Co., 209 S. W. 582; Carroll v. United Rys. Co., 157 Mo. App. 247, 269.   (b)   This instruction clearly presented the defense made by defendant, and its refusal was error. Northam v. United Rys. Co., 176 S. W. 227; Devitt v. Railroad, 50 Mo. 302; Harris v. Railroad, 203 Mo. App. 324.   (4)   The court erred in refusing instruction No. 1 requested by plaintiff.   (a)   Because it directed a verdict for plaintiff on the whole case upon facts therein hypothesized, which did not constitute negligence as a matter of law, without requiring a finding that such facts constituted negligence.   Willi v. United Rys. Co., 205 Mo. App. 272.   (b)   Because it assumed and told the jury that the boiler head was in a loose condition.   (c)   Because it assumed that the loose condition of the boiler head and the fact that plaintiff was ordered to work around it was negligence as a matter of law.   (d)   Because this instruction assumes that the boiler head fell as a result of its loose condition.   (e)   Because this instruction, which directed a verdict on the whole case, failed to require the jury to find that the plaintiff was injured as a direct result of the alleged loose condition of the boiler head.   Hof v. Transit Co., 213 Mo. 445, 468. (f)   Because this instruction authorized a recovery upon a finding that the boiler head was loose when the petition

does not charge and the evidence wholly failed to show that the boiler head was loose. The pleadings and evidence only claim and show that an arch on the man-head (a small portion of the boiler head) was loose. The court erred in giving instruction No. 3 at the request of plaintiff. (a) Because it assumes that the position or place in which plaintiff was required to work was not safe. (b) Because it assumes that there was danger of the boiler head falling, and withdrew from the consideration of the jury the question of whether plaintiff was guilty of contributory negligence or not. Wilson v. United Rys. Co., 181 S. W. 19, l. c. 20-21.

*Foristel & Eagleton* for respondent.

(1) The court ruled correctly in overruling the demurrer to the evidence, because: (a) There was sufficient evidence to go to the jury on the charge of fraud in the procurement of the release. (b) If the jury found (as it might do) that the release was procured by fraud and deceit, then it was not available to defendant as a defense, to set up and claim that plaintiff was negligent, at least not as a matter of law, in signing the paper in ignorance of its character and contents, and in reliance on defendant's representation as to such character and contents. Cottrill v. Krum, 100 Mo. 397; Warnell v. Kem, 57 Mo. 478, 493; Bank v. Richmond, 235 Mo. 532, 543; Snyder v. Express Co., 63 Mo. 376, 383; Ochs v. Railroad, 130 Mo. 43-4; Mateer v. Railroad, 105 Mo. 353; Crim v. Crim. 162 Mo. 544; O'Bryan v. Kinney, 74 Mo. 125; R. R. v. Cleary, 77 Mo. 637; Kellerman v. Railroad, 135 Mo. 188; Layson v. Cooper, 174 Mo. 211, 220; Tait v. Locke, 130 Mo. App. 273; Carroll v. Railroad, 157 Mo. App. 247, 269; Spellman v. Railroad, 187 Mo. App. 125; O'Shea v. Lehr, 182 Mo. App. 690-1; 1 Page on Contracts (latest Ed.), sec. 233, pp. 350-1. (2) The issue whether or not plaintiff was negligent in signing the paper in ignorance of its contents, and in reliance upon the representation of defendant as to such contents was, on the record, if available at all as a defense, a

matter for the jury. Cases cited under point 1 and in addition thereto: Layson v. Cooper, 174 Mo. 211, 220; Meisenhelter v. Lead & Zinc Co., 192 S. W. 147, 149; Edwards v. Tam & Mfg. Co., 204 S. W. 546.

DAUES, J.—This is an action for damages for personal injuries. At the trial before the court and a jury there was a verdict and judgment for plaintiff for $1,000. Defendant appeals.

The petition alleges that plaintiff on April 10, 1919, while employed by defendant to clean certain boilers, was injured by being burned and scalded by water and steam with which he came into contact, and that such injuries resulted from the carelessness and negligence of defendant in failing to use reasonable care to furnish him with a reasonably safe place in which to work, and in ordering him to look into a fire box under the boiler when defendant knew, or could have known, that the boiler was defective and likely to cause steam and hot water to be thrown upon plaintiff.

The answer is, first, a general denial; then the defense of assumption of risk; then a plea of contributory negligence, and finally, the answer alleges that on April 21, 1919, plaintiff, for a valuable consideration, released defendant from all claims on account of injuries sustained by him, as charged in the petition, and that therefore plaintiff should be barred from maintaining this action.

The reply denies the allegations of new matter stated in the answer, and further alleges that plaintiff knew nothing of the alleged release pleaded in the answer. It alleges further that defendant's agent, shortly after plaintiff left the hospital, where he was confined on account of said injuries, handed him a check for $17.50, and represented this check to be in payment of his straight time while he was confined in the hospital, and that such agent asked plaintiff to sign a slip of paper which said defendant's agent represented to plaintiff to be a receipt for his straight time while he was in the hospital; that on May 6, 1919, this same agent again handed plaintiff

a check for $30, which he represented was in payment for work and straight time. It is further averred that plaintiff can neither read nor write, and that any release, or purported release obtained by defendant company was through misrepresentation, fraud and deceit.

There are five separate assignments of error contained in appellant's brief, the first of which assigns error in overruling and refusing to give an instruction in the nature of a demurrer to the evidence; the other assignments concern the giving and refusing of instructions submitting the case to the jury.

Respondent's brief concedes that the court committed reversible error in the giving and refusing of instructions, and in confessing such error asks that the judgment be reversed and the cause remanded. Appellant, however, maintains that because of error committed under the first assignment, the judgment should be reversed outright. Thus the issues are definitely sharpened to this point.

Learned counsel for appellant assert that the court erred in refusing to direct a verdict for defendant, first, because there was no substantial evidence that the release was procured by fraud; secondly, because plaintiff was guilty of negligence in failing to exercise ordinary care in relying upon the alleged false representation in the procurement of the release, and in failing to exercise ordinary care to ascertain the contents of the release before he signed same. We therefore recite so much of the record evidence as becomes pertinent to these contentions.

Plaintiff, on his direct examination, testified as to his employment by the defendant as a boiler washer; that while engaged in his work in washing a boiler at the Buckingham Hotel he was injured by being scalded by hot water and steam.

Most of the cross examination of plaintiff revolved around the question of the release. Plaintiff, after the injury, was taken to the Barnes Hospital, where he remained about a week. He then went home, where he re-

mained about two weeks longer before he returned to work. He then went back to work, and after about two days signed a paper, which is introduced in evidence, and which purports to release the defendant from all damages for the injuries so received, in consideration of carrying plaintiff on the payroll at full time during his disability and in furnishing him medical attention.

Plaintiff (on cross-examination), said he was 26 years of age; that he could neither read nor write, except to write his name, and that he had learned to write his name only a short time before while in the Army, though he admitted that he had signed his name before that time; that he had worked for the defendant company about two and a half years; that he quit and went into the Army and returned and again went to work for defendant as a boiler washer; that before he went into the Army, J. R. Smart was a pipefitter for defendant, but when plaintiff returned Smart had become a foreman, and it was to him that he applied for a job. Smart's office was at Tenth and St. Charles streets in St. Louis.

Without dwelling upon the evidence concerning the facts causing the accident, the record shows that after plaintiff was injured and while he was in Barnes Hospital, another foreman for defendant named Jones, brought his wages to him. This was three and a half days' pay at $3 per day, and the check amounted to $10.50. During the time he was at the hospital and at home he was treated by Dr. Brooks, a physician in the employ of defendant company. After plaintiff had been home for about three weeks, he went to defendant's office at Tenth and St. Charles streets and called on Smart, who told him "to get well and come on back to work;" that he asked Smart what the company was going to do for him, and that Smart told him he did not know; that he would have to go and see the company about that.

Plaintiff was paid two checks, one for $17.50 and the other for $30. It is not clear as to the exact date of these payments, but, according to plaintiff, the pur-

ported release was signed at the time he received the $17.50 check. Concerning the signing of the release we set out extensively from plaintiff's cross examination:

"Q. Now, do you recall that, on this day, he gave you a check for $17.50 or a quarter or something like that? A. Yes, sir.

"Q. Now, you didn't have any seventeen dollars and a half check coming to you for work that you had done, did you? A. No, sir.

Mr. Goodwin "(Q.): You knew you were getting that seventeen dollars and a half because Smart told you you were going to get your full time, didn't you? A. He told me he would give me full time when I wasn't laying in the hospital.   .   .   .

"Q. The first check you got was for time that you had worked? A. The first check.

"Q. Was for three days and a half, wasn't it? A. Three days and a half.

"Q. That was the first check you got? A. Yes.

"Q. Now, the next check you got was for time you hadn't worked, but you had been in the hospital and hadn't been able to work—that was for seventeen dollars and something, wasn't it? A. Yes, sir.

"Q. And then, later on, you got another check for thirty dollars? A. Yes, sir.

"Q. For time that you hadn't worked. A. Yes, sir.

"Q. Now, I want to ask you, if on this occasion when you were at Smart's office and Mr. Jones was there, you didn't tell Smart that that settlement of giving you full time while you were sick and couldn't work and paying your doctor bill would be all right with you—didn't you tell Smart that? A. No, sir.   .   .   .

"Q. Now, after you got this seventeen dollar check, about how long did you go before you went back to the company? A. Two weeks.

"Q. Two weeks after you went to work for the company, and had been working about two days, and one day at noon you went down to Tenth and St. Charles

and met Mr. Smart coming on the outside of the building, didn't you?  A.  Yes, sir.

"Q.  You were standing out there, weren't you?  A. I was standing outside when he come.

"Q.  You hadn't gone into Smart's office, had you— you hadn't gone in on the inside of the building at all, had you?  A.  No, sir.  .  .  .

"Q.  And it was during the noon hour, and several of the men that worked around there were standing about in places at the front, weren't they?  A.  No, sir; at that present time they wasn't.

"Q.  At that noon hour, they weren't?  A.  No, sir.  .  .  .

"Q.  He (Smart) said, 'I have got a check for you, and I have got a release for you to sign?'  A.  No, sir; he never said that.

'Q.  What did he say to you?  A.  He told me to sign for my pay check.

"Q.  Sign for your pay check?  A.  Yes, sir; and he had it folded up.

"Q.  At that time, you had only been working with the company two days; isn't that right?  You had just gone back to work after your sick spell, hadn't you?  A. Yes, sir.

"Q.  And you hadn't earned anything yet?  There hadn't come any pay day for the work you had done after you had gone back, had there?  A.  No, sir.

"Q.  When he said, 'I have your pay check,' you knew he referred to a check for the full time while you had been sick, didn't you?  A.  He come and told me that was a pay check.

"Q.  Pay check?  A.  Told me to sign for my pay check.

"Q  When he saw you and said, 'I have got your check for you,' you knew that that was a pay check, didn't you?  A.  Yes, sir.

"Q.  And he gave that to you and told you to sign this paper, didn't he?  A.  He told me to sign the paper

for my check. He didn't say any release or nothing. He had it folded up.

"Q. I will ask you if he didn't read this over to you. Didn't he read it out loud to you? A. No; he didn't read it at all; he had it folded up when I seen it. . . .

"Q. I will ask you if after he read it you didn't take it and read it? A. No, sir.

"Q. And you said, 'All right; give me your pencil and I will sign it? A. No, sir.

"Q. And he said 'Sign it with my fountain pen?' A. No, sir; you are wrong about that—

"Q. You took that fountain pen, and you laid the paper on that automobile fender, in broad daylight, didn't you? A. Yes, sir.

"Q. And you wrote your name right down there on it, didn't you? A. Yes, sir. . . .

"Q. Do you tell the jury now that Mr. Smart didn't tell you on that occasion that you were signing a full release for all claims that you had against the company? A. No, sir; he said I was signing for my pay check. . .

"Q. Your understanding was they were to give you straight time when you were in the hospital and getting well and pay your doctor bill, and you would release them—that was your understanding, wasn't it? A. No, sir. . .

"Q. Did you ask Smart to read this paper to you? A. No, sir; I did not. . . .

"Q. You could read it, you say, yourself? A. No, sir: I can't read. . . .

"Q. When did you sign this one paper, when you got the seventeen-dollar check or when you got the thirty-dollar one? A. The seventeen. . . .

"Q. After you got your thirty-dollar check, you were then working for the Union Electric Company, weren't you? A. Yes, sir. . . .

"Q. Well, he (Smart) asked you why you were suing the company, didn't he? A. He asked me why I were suing the company.

"Q. And you told him you thought you ought to have more, didn't you? A. I told him the company ought to give me more money; that is what I told him. .

Mr. Goodwin "(Q.): You knew you didn't have a pay check coming, didn't you? A. He just told me to sign for it, and I was going by his word."

The following question and answer also appears in plaintiff's cross examination:

"Q. Well, you say Smart told you, you were signing a receipt for your pay check—you want us to believe that? A. That is what he told me—that is what Smart told me."

Such is plaintiff's testimony as to the facts and circumstances surrounding the signing of the paper. We rule against defendant's first insistence, to-wit that there was no substantial evidence that the release was procured by fraud.

And we likewise rule that the question whether plaintiff was estopped to complain of his ignorance of the character and contents of the release, on the ground of his negligence in failing to acquaint himself of such character and contents, was at most a question for the jury.

Counsel for appellant rely upon the cases of Hall v. Kansas City Rys. Co., 209 S. W. 582, and Carroll v. U. R. Co., 157 Mo. App. 247, 1. c. 269, 137 S. W. 303.

In the Hall case, the Kansas City Court of Appeals had before it an action for damages by a servant of the Kansas City Southern Railway Company. The employer pleaded a full release. The evidence showed conclusively that the agent of the employer fraudulently procured such release. The servant was injured about the eyes and could not see to read, and failed to have his relatives, who could read and who were about him, read to him the paper he was signing, at the insistence of the employer's agent, and because such servant failed to have members of his family, who were about him, read such paper to him, the court held such servant guilty of negligence barring his right to have set aside the release which he signed.

The Hall case relies upon the following authorities: Anderson v. Drug Co., 149 Mo. App. 554, 130 S. W. 829; Crim. v. Crim., 162 Mo. 544, 63 S. W. 489; Paris Mfg. & Imptg. Co. v. Carle, 116 Mo. App. 581, 92 S. W. 748; First National Bank v. Hall, 129 Mo. App. 286, 108 S. W. 633.

In the case of Anderson v. Drug Co., it will be observed no false representations were made to induce plaintiff to sign the release. Judge GOODE, in the opinion, clearly points out that the plaintiff failed to acquaint himself with the character and contents of the release, and that no misrepresentations were made by the defendant's agent with reference to same, saying: "But such conduct does bar her unless its effect is broken by some other fact sufficient to excuse her behavior, such as fraud on the part of defendant or mental incapacity on the part of plaintiff." Again, the opinion reads: "It is trite law that a person is expected to learn what an instrument contains before he signs it, either by reading or having it read, or by having its contents stated by someone on whom he has a right to rely, the circumstances considered, and provided either method of obtaining the information is available without too great inconvenience. If such a precaution is not taken, when it can be, and no deceit or artifice is practiced to mislead the signer, then usually he will be held bound by the obligation of the writing."

In Crim. v. Crim., supra, there was no evidence of fraud, misrepresentation, trick or concealment in procuring the signature to the paper.

In Paris Mfg. & Imptg. Co. v. Carle, Judge GOODE again said: "The rule now is that unless some artifice or fraud is practiced to induce a party to sign a contract, such party signing cannot avoid the obligation of the instrument by denying that he knew the contents of same."

First National Bank v. Hall was a case between the innocent holder of a note on the one hand, and the maker of the note on the other, and bears no influence to the question at hand.

We think the rule is well stated in Ely v. Sutton, 177 Mo. App. l. c. 553, 162 S. W. 755, in which this court, through Judge ALLEN, said:

"Under what circumstances a party will be permitted to contradict the terms of the written instrument which he has signed, and be allowed to show that the contract which it contains was not the real contract between the parties, and that his signature to the writing was procured through fraud, is a question concerning which much may be written and as to which the authorities are not entirely harmonious. The general rule, however, is well established, that, where a party is *sui juris*, in possession of his faculties, is able to and has full opportunity to read the instrument which he signs, and executes it without fraud practiced upon him, the Law presumes that he knew its contents, and he will not be permitted to take advantage of his own fault or negligence and be heard to say that the instrument did not express the real contract;" citing Crim v. Crim, 162 Mo. App. l. c. 552, 63 S. W. 489, and a long line of authorities.

In O'Shea v. Lehr, 182 Mo. App. l. c. 690, 165 S. W. 837, this court said:

"Where one is induced by another to rely upon his reading the contract to him before signing, and such person misreads it, with a view to deceive, and thus obtains his signature to a document different from that intended, relief may be had on such showing alone. But this proceeds from the fact that such a betrayal of confidence is both so revolting and so infrequent that it is not likely to be anticipated by the average man. [See Tait v. Locke, 130 Mo. App. 273, 282, 109 S. W. 105; Carroll v. Peak, 156 Mo. App. 446, 136 S. W. 961.]

"However, cases of that character are not identical with those where nothing more appears than a mere misrepresentation of the contents or character of a paper to which another affixes his signature. In cases of the character last referred to, something more must appear to invalidate the contract than that the party merely signed the note without reading on being told by the party presenting it that it was a receipt. When it ap-

pears that the person so signing the note is amply able to read and understand and is familiar with business transactions generally, he may not be relieved of an obligation on the grounds of fraud or misrepresentation, unless something more appears to mislead or trick him than the mere fact the party presenting the note said it was a receipt."

In Magee v. Verity, 97 Mo. App. 486, 71 S. W. 472, it was held that the mere falsely representing to a man in possession of his faculties and able to read, that a writing involves the verbal understanding of the parties, is not the fraud which will set aside a contract.

In Birdsall v. Coon, 157 Mo. App. 439, 139 S. W. 243, it was held that a lawyer "perfectly capable of looking after his own interests, and reading the contract," but who failed to read the contract, which was handed him by a book agent, was negligent in not himself reading the contract.

This court, in Childers v. Northern Pac. Ry. Co., 218 S. W. 441, held an injured employee's release, discharging the employer from liability procured by defendant's claim agent by leading the employee who was unable to read and to whom the release was not read to believe that he was signing merely a report giving the details of the accident, was void as having been obtained by fraud. [See, also, Spellman v. Railroad, 187 Mo. App. l. c. 125, 172 S. W. 1163; Layson v. Cooper, 174 Mo. l. c. 220, 73 S. W. 472.]

In the instant case, plaintiff testified that fraud and deceit was practiced upon him by defendant's foreman, in that the foreman told him he was signing for his pay check, and that it was a receipt for his pay check for which he was signing. Plaintiff was an ignorant and illiterate man, who could neither read nor write; he was at the time on the public street where, he says, none of his co-workers, or anyone else that he knew, was present, and while it may be assumed that there were persons passing by, there is no evidence that anyone was near except defendant's foreman, to read the paper to him. Had the plaintiff been a man who was able to read, we would hold

him to have been negligent as a matter of law in failing to read the paper. But he was compelled to rely upon somebody to give him the contents of the paper. There was no one else about, so he relied upon the foreman, a former fellow-employee, who had risen to the position of foreman, who told him that the paper was a receipt for his pay check.

While we do not find ourselves in accord with all that is said in the Hall case, supra, the facts in that case are fairly distinguishable from the facts in the instant case. In the Hall case, the plaintiff was in his home with his family about him, they could read; it was a very easy matter for him to have one of the family read the paper to him; he, however, did not exercise the care to do this, but signed without having same read to him. In the instant case, plaintiff had no one to rely upon to read the paper to him, if his testimony is taken as true, except the defendant's agent, who, as above stated, had been a co-worker with plaintiff. Plaintiff had been given a fountain pen to sign the "receipt," placing the paper on the fender of an automobile in the street, a far different situation from the facts in the Hall case. We think under such facts and circumstances, it was a question for the jury whether or not there was fraud practiced by defendant's agent, and, at most, a question for the jury as to whether plaintiff was negligent in failing to have someone else to read the paper for him.

The case of Carroll v. Railways Co., supra, relied upon by appellant, is not sufficiently in point to call for analysis.

We have examined appellant's complaint that there is a variance between the allegations of fraud in plaintiff's reply and the evidence. We are convinced there is no merit in this contention, and therefore rule against appellant on that point.

We therefore rule that on the confessed errors in the giving and refusing of instructions, the judgment should be reversed and the cause remanded. It is so ordered.

*Allen, P. J.,* and *Becker, J.,* concur.