OLLIE J. MULLER, RESPONDENT, v. MUTUAL BENEFIT HEALTH & ACCIDENT ASSOCIATION, APPELLANT.—68 S. W. (2d) 873.

Kansas City Court of Appeals. February 19, 1934.

*Palmer & Palmer* for respondent.

*Jones & Wesner* for appellant.

REYNOLDS, C.—This suit originated in the Circuit Court of Pettis County by the filing of her petition therein by the plaintiff on the twenty-third day of March, 1933. The defendant is an insurance association organized and existing under the laws of Nebraska and lawfully engaged in the health and accident insurance business in the State of Missouri. On the eighteenth day of February, 1924, the defendant issued its certain policy of insurance to one Andrew J. Muller at the city of Atlanta in the State of Missouri by which, for a consideration therein expressed, it insured the life of the said Andrew J. Muller, should death result to him during the life of said policy by reason of and through bodily injuries resulting from accidental means, directly and independently of all other causes, and agreed to pay, in the event of such death through and from injuries so received, within thirteen weeks from the date of said injuries, to Ollie J. Muller, the beneficiary named therein, the sum of $2,000 and delivered said policy to the said Andrew J. Muller. Thereafter, at the time when said policy was in full force and effect, to-wit, on the thirteenth day of May, 1932, the said Andrew J. Muller died as a result of injuries alleged to have been received by him on the eighth day of April, 1932, and upon the twenty-third day of May, 1932.

The petition is as follows:

"Comes now the plaintiff and for her cause of action states that the defendant is now, and was at the times hereinafter stated, a foreign insurance association, organized and existing under the laws of Nebraska, and is engaged in the business of issuing and selling policies of accident and health insurance; that the defendant is licensed to do, and is doing business in the State of Missouri.

"Plaintiff states that she was the wife, and is now the widow, of Andrew J. Muller, and that heretofore, to-wit: on the 18th day of February, 1924, in the City of Atlanta and State of Missouri, by its certain policy of insurance No. 40-15625, defendant, in consideration of the payment of a certain premium then and there paid and a payment in advance thereafter of ten dollars each quarter, insured the life of Andrew J. Muller and issued to him the aforesaid policy, which is now in the possession of the defendant, wherein and whereby the said insurance association upon the death of said Andrew J. Muller, sustained by and through bodily injuries resulting from accident, agreed to pay to the beneficiary named in said policy of insurance, Ollie J. Muller, plaintiff in this cause, the face amount of said policy, being the sum of two thousand dollars, within thirteen weeks after the date of the death of Andrew J. Muller.

"Plaintiff states that heretofore, to-wit: on the 8th day of April,

494

1932, and on the 23rd day of May, 1932, said Andrew J. Muller sustained such accidental bodily injuries that death resulted therefrom on the 29th day of May, 1932, in the City of Havana, State of Illinois, directly and independently of all other causes; and that said bodily injuries were sustained through purely accidental means within the provisions of said policy and that said accidental injuries caused the death of Andrew J. Muller in less than thirteen weeks from the date of said accidental injuries.

"Plaintiff further states that she gave notice to the defendant of the death of the said Andrew J. Muller and furnished proof of death to the defendant, and performed all the requirements of said policy on her part; that said policy was in full force and effect at the time of the said accidental injuries; that this suit is brought more than sixty days after the furnishing of said proof and within two years of the date of said accidental injuries; that the defendant has neglected and vexatiously refused to pay to the plaintiff the sum of two thousand dollars, though demand for said sum has been made on the defendant and that defendant is now indebted to this plaintiff in the sum of two thousand dollars, less the sum of seven hundred and fifty dollars, under said contract of insurance.

"Wherefore, plaintiff prays judgment against said defendant for the sum of two thousand dollars, less the said sum of seven hundred and fifty dollars, with interest thereon at the rate of six per cent from the 29th day of July, 1932, and ten per cent on that amount as damages for defendant's vexatious refusal to pay the amount of said policy, together with a reasonable attorney's fee and her costs in this behalf expended."

To this petition, the defendant filed an amended answer as follows:

"Comes now the defendant in the above entitled cause and for its amended answer to plaintiff's petition says that it denies all the allegations therein contained.

"Wherefore, having fully answered, defendant prays that it be discharged with its costs herein expended.

"For further and special answer, defendant says that on the 18th day of February, 1924, defendant issued its accident policy No. 40-15625 to one Andrew J. Muller; that by the terms of said policy, defendant insured the said Andrew J. Muller against loss of life resulting directly and independently of all other causes, from bodily injuries sustained through purely accidental means, subject, however, to all the provisions and limitations therein contained.

"That said policy contains a provision specified as 'Accident Indemnities—Part A. Specific Losses;' whereby it is provided that if the insured shall, through accidental means, sustain bodily injuries

as described in the insuring clause, which shall, independently and exclusively of disease and all other causes, immediately, continuously and wholly disable the insured from the date of the accident and result in death within thirteen (13) weeks, the association will pay for the loss of life—$2,000.

"Defendant expressly denied that the death of Andrew J. Muller was caused in such a manner as to bring it within the aforesaid terms of said policy.

"Defendant says that on or about the 29th day of May, 1932, Ollie J. Muller claimed to the defendant that Andrew J. Muller came to his death on said date; and on or about the 31st day of May, 1932, the said Ollie J. Muller made, executed and delivered to one Edward H. Niederer of Havana, Illinois, an assignment of all sums of money due or to become due her on the aforesaid policy to secure the payment of certain funeral expenses in the sum of four hundred seventy ($470) dollars incurred by the said Ollie J. Muller on account of the death of her said husband, Andrew J. Muller. That thereafter the said Ollie J. Muller and Edward H. Niederer made claim against this defendant for the sum of two thousand dollars ($2,000) on its policy on account of the death of the said Andrew J. Muller. That defendant immediately investigated the claim so made and from its investigation of the circumstances surrounding the death of the said Andrew J. Muller, this defendant became honestly convinced that it was not indebted on its said policy to the said Ollie J. Muller and Edward H. Niederer in any sum whatsoever; and then and there denied liability on its said policy to them; and denied that the death of Andrew J. Muller was covered by its policy or that it owed said claimants any sum whatsoever on account thereof.

"Thereupon a dispute arose betwen the said Ollie J. Muller, Edward H. Niederer and this defendant as to the validity of the claim so made, and on account of the aforesaid facts and in view of the denial of liability by defendant and the circumstances surrounding the death of the said Andrew J. Muller, the said parties agreed that it was for the best interest of all concerned that the matters in dispute be compromised, settled and adjusted so that vexatious litigation, annoyance and expense would be prevented. That the said Ollie J. Muller and Edward H. Niederer then and there agreed to compromise, settle and adjust all of their claims and demands against this defendant which they had or might be entitled to on account of said policy issued to Andrew J. Muller by defendant; and agreed to accept in full accord and satisfaction of said claims the sum of seven hundred fifty ($750) dollars. That defendant, although not admitting any obligation to said claimants, but in order

to save vexatious litigation, annoyance and expense, then and there paid to them the sum of seven hundred fifty ($750) dollars in full accord and satisfaction of their disputed claims; and in consideration of the payment to them of said sum of money, the said Ollie J. Muller and Edward H. Niederer made, executed and delivered to this defendant their receipt and release in writing, which release is attached hereto, marked Exhibit 'A' and made a part hereof; whereby they released and forever discharged defendant from any and all claims and demands of any kind or character which they had or might have arising out of or by virtue of the said policy of insurance and thereby declared that they accepted said sum of money in full satisfaction, compromise, settlement and adjustment of any and all claims of every kind or character under said policy. Defendant hereby pleads said release in bar of plaintiff's alleged cause of action set up in her petition.

"Wherefore, having fully answered, this defendant prays that plaintiff take nothing by her petition and that it be discharged with its costs."

To defendant's amended answer, there was annexed, as Exhibit A, a verified copy of the release referred to therein.

To this amended answer, the plaintiff filed an amended reply as follows:

"Plaintiff for reply to defendant's amended answer filed herein, admits the issuance of said insurance policy No. 40-15625 and the said provisions thereof and the death of Andrew J. Muller, but denies each and every other allegation therein contained.

"And for further reply, plaintiff denies that an assignment of said policy of insurance was ever made by her or by any authorized person for her, to one Edward H. Niederer, or to any other person, and doth aver that if such assignment was procured, it was through deceit and fraud and without knowledge of plaintiff; and that plaintiff notified the defendant's agent, while in his presence and in his office at Springfield, Illinois, that she had not made any assignment of the said policy to Edward H. Niederer and knew nothing about such purported assignment; and further, that notwithstanding such notice by plaintiff to defendant's agent, defendant wrongfully, knowingly and fraudulently recognized such purported assignment and proceeded to negotiate with the purported assignee, Edward H. Niederer, for a settlement and compromise of plaintiff's two thousand ($2,000) dollar claim against said defendant.

"Plaintiff for reply to the last alleged defense avers that the alleged release set forth in such defense was without consideration and void.

"Plaintiff doth further aver that no compromise or settlement of her said claim was made by her with defendant, or by any authorized person or agent for her, and denies that she ever executed any release to defendant; or, that if she did sign any release of her claim to defendant she did so without knowledge that it was a release, and that such signature was obtained wrongfully and by the fraud, false representations, and impositions by the defendant and its agent practiced upon the plaintiff at the time of the alleged execution thereof, in this, to-wit:

"That defendant's agent called on plaintiff and tried to induce her to sign a paper; that plaintiff is unable to read and write, except to trace her name, and is inexperienced in business affairs; that plaintiff requested that said paper be read to her, but it was not read to her; that the contents of said paper were unknown to her, and plaintiff was led to believe that it was an instrument to take care of the undertaker's bill; that plaintiff was told by defendant's agent that if she did not sign that paper she would not get anything; that plaintiff was finally induced to sign said paper, while under a highly nervous strain, without knowledge of its contents, believing it to be an advancement on her husband's insurance policy to the undertaker to take care of the undertaker's bill, and with no knowledge that it was a release of her rights in said policy and of a cause of action; that plaintiff was not told at any time before said paper was signed that defendant was settling plaintiff's claim against said defendant; that a release was never mentioned to her, and plaintiff avers that had she known that such paper was a release she would not have signed it.

"Wherefore, plaintiff says that said alleged release is of no effect and void, and she prays judgment as in her petition."

Such amended reply was not verified.

There is substantial evidence tending to show that the insured, Andrew J. Muller, on the eighth day of April, 1932, near Havana, Illinois, was injured by a heavy range stove falling against and upon him while he was engaged in its removal from a wagon upon which it had been loaded and transported to the place named, to which place the insured together with plaintiff, his wife, was at that time moving as their home; that said stove, in being slidden upon a pole from the wagon to the ground, fell from the pole and struck the insured in such a way as to knock him to the ground and to fall upon and across his chest and cut his arm and severely injure him; that Dr. W. A. Steele, a duly licensed and practicing physician of Havana, Illinois, on the twelfth day of April, 1932, was called to examine and treat him professionally on account of the injuries so received; that he found the insured suffering at that time from

what he termed a decompensated heart, which meant, as explained by him, heart strain and an overdone heart muscle; that, from the date of the injury received by the insured to about the last of May following, he was unable to do any work or labor by reason of his injuries so sustained; that about the last of April, he had made some improvement and was barely able to be up along in May and towards the last of that month; that, immediately after the injury, the insured felt bad and Dr. Steele, on his first visit, examined him and put some little strips across his ribs. He had been unable to get to the doctor earlier than the date of his first examination, April 12. Dr. Steele saw him professionally several times after April 12 for his injuries. The last date upon which he saw him or made any examination of him, he gave as May 27, 1932. At that time, the insured's heart had improved a great deal; and the doctor advised him that he might return to some of his garden work. In the latter part of May, a few days prior to his death which occurred during the night of May 29 or the early morning of May 30, 1932, the insured, while seeking to adjust a rod which extended up and down in a well on his premises and had in some manner got out of order, fell and was again injured. The well, which was several feel deep, was covered at the top by a large log on either side lying across it, with boards lying between. The insured, in the prosecution of his work, was standing on one of the boards which broke and, giving away, let him fall into the well and strike his breast upon the log on one side. He was a rather heavy man and was severely injured. He was unable to help himself after the injury. The plaintiff, after considerable work, got him up and out of the well, into the house and on to the bed. He was badly swollen, and his chest bulged out. He suffered. He was never able to get out of bed again. He might have exerted himself trying to move in the bed but could never get up. He had been in fairly good health prior to his injury of April 8, 1932. He had a large breast and claimed to be double breasted. On none of the examinations of the insured, prior to his death, by Dr. Steele, did the doctor find any evidence of a broken rib or broken ribs.

On the thirty-first day of May, 1932, an autopsy was performed upon the body of the deceased Muller by Dr. W. A. Steele and Dr. F. J. Corey, the latter being also a duly licensed and practicing physician residing at Havana, Illinois. Upon the examination, an incision into the breast of the deceased was made; some broken ribs were found, some fractures about the mid clavicular line. Three or four were found to be fractured. They were complete fractures, the bones entirely separated. A rupture of the intraventricular septum, otherwise described as a rupture in the thin part of the ventricle,

was also discovered. Dr. Corey testified that he found two ruptures, one in the right and the other in the left ventricle. The broken ribs were found to be well over the heart. An examination of the condition of the outer surface of the body over the broken ribs revealed no bruises, no discoloration, no abrasions, no external evidence of trauma, no ecchymosis—in other words, nothing wrong to indicate any trouble on the inside.

The depositions of the two doctors were taken and introduced in evidence. It was testified by Dr. Steele that, in his opinion, the fracture of the ribs was not sufficient alone to have produced the death of the deceased but that whatever force caused such fractures also made sufficient compression to cause the rupture of the heart muscle and the rupture was sufficient to produce death; that, in his opinion, death ensuing from an injury so occasioned would follow closely upon the injury. In his judgment, the injured person might live two or three or four days. At another place, he gave it as his opinion that one could not linger so long as two or three days with such injury prior to his death; that the length of time that one might live might depend upon the size of the rupture and the amount of blood escaping through it; that, in his opinion, the rupture of the heart found could not have been caused by disease; that, when he examined the deceased on the twenty-seventh day of May, 1932, his heart condition was fairly good and that rupture of the heart from disease does not occur without a bad heart condition immediately previous and usually requires considerable physical strain to produce it; that the presence of blood found in the mediastinum negatived the idea that deceased's ribs were broken and his heart punctured after his death. He never knew of any other accidents happening to the deceased than those of April 8 and May 23. Dr. Steele testified that the deceased had consulted him several times within a year or so for minor things, the first thing of importance being when he was called in April.

Dr. F. G. Corey testified as follows:

"Q. What did you find, Doctor? A. May I refer to the report of the inquest?

"Q. Yes, sir. A. From external appearances, unhurt; there was no abrasions. We opened the chest and found ruptures on either side of the ventricular septum; one on the right side and one on the left.

."Q. Doctor, was the internal injuries sufficient to have produced death, from your examination? A. Yes, sir. _____

"Q. Doctor, what ribs did you find broken? A. Third, fourth, fifth, and sixth on the left side, in the middle line.

"Q. How much of a fracture existed in those ribs? A. Complete fractures; complete separation of them.

"Q. How much of a rupture was there in the heart? A. Very pronounced; a jagged opening.

"Q. Could you, from your examination there at that time, conclude whether the rupture of the heart was produced by external force or by disease? A. Yes, we could determine.

"Q. And what was the fact in that regard? A. It was caused by a puncture from a broken rib.

"Q. In other words, you could tell from your examination that the ribs had been pressed down so that the end of one of the ribs actually punctured the heart, is that it? A. Yes, sir.

"Q. Doctor, are you able to state, from your experience as a physician, how long a man could live after having sustained the injuries which you found when this autopsy was performed? A. Perhaps a few minutes.

"Q. Would it have been possible for him to have lived a day? A. I don't think so.

"Q. Now, was there anything in the condition of Mr. Muller from which you could determine definitely whether or not the conditions you found there had occurred prior to or subsequent to his actual death? A. I would say that the fracture was recent; that it had occurred within twenty-four hours from the time we had performed the autopsy.

"Q. Now, what is the fact as to whether it would have been possible for those conditions to have been produced in some way after he actually died? Was there anything about the condition from which you could tell definitely whether it was before or after he died? A. I stated before that in my opinion the fracture was of recent origin. Relative to the time that we performed the autopsy the fracture perhaps had occurred within twenty-four hours before the time we performed the autopsy. I don't know when he died.

"Q. So, if he had been dead longer than twenty-four hours, why, then this condition probably occurred after his death, and if he had been dead shorter than twenty-four hours, it might have occurred prior to his death; but you couldn't tell definitely? A. No, sir; I wouldn't want to say.

"Q. Are you able, Doctor, to form any opinion as to the amount of force necessary to cause a fracture of the ribs which you found there when you performed the autopsy? A. In an old person like this man was, it wouldn't require much force."

Upon the trial, defendant introduced in evidence a written assignment of the policy sued upon to Edward H. Niederer, the un-

dertaker, who had charge of the body of deceased for burial and who furnished the coffin and other equipment and supplies for the funeral. The plaintiff denied that the same was genuine, that she had ever executed the same, that the signature thereto was hers or was authorized by her, or that she knew anything about it. She stated that she had signed a death certificate at Niederer's request but had not signed the assignment. The execution of the assignment offered in evidence purported to have been acknowledged before Robert E. Niederer, a notary public. Neither Edward H. Niederer nor Robert E. Niederer was produced to impeach her denials. The defendant further introduced in evidence the written release for $750, referred to in defendant's amended answer and annexed thereto as Exhibit A, as having been executed on the fourteenth day of July, 1932 to defendant by the plaintiff and by Edward H. Niederer, as assignee, purporting to be in full compromise and settlement of the policy. The plaintiff testified that she knew nothing of such release, that no such instrument was ever read to her or its execution acknowledged by her, that she had never signed or executed the same, and that the signature thereto was not genuine and was not her signature. She denied that there was any controversy between herself and defendant, except defendant claimed she had assigned the policy to Edward H. Niederer and could not collect it and she denied having made such assignment.

The defendant also introduced in evidence a certain draft drawn by it for the sum of $750 payable to the order of plaintiff and of H. Paul Jones, her attorney, and of Edward H. Niederer, through the Omaha National Bank, with the endorsement of each of the payees named therein, thereon, including that of plaintiff, purporting to be in full payment, satisfaction and discharge, compromise and release of any and all claims of liability then or thereafter to be made by said payees under the policy in suit on account of the death of the deceased Andrew J. Muller.

The plaintiff admitted, in her testimony, the endorsement of the draft but denied that it was voluntarily made or that it was ever read to her or the contents thereof explained, although she repeatedly, before endorsing the same, requested that she be permitted to see it and that its contents be explained. There was also a request by one Mrs. Ramsey, a friend of plaintiff's, who was present at the time, that she be permitted to read it to her, which request was also refused. Plaintiff denied that H. Paul Jones was her attorney or had any right to make any settlement for her or that Niederer had any such right and asserted that H. Paul Jones was the attorney for Edward H. Niederer and was not her attorney.

There was evidence from which it might be found that she was inexperienced in business affairs; that she was unable to write anything other than her name; that the draft was not read or explained to her but that its purpose and contents were misrepresented to and concealed from her; and that, at the time she made the endorsement, she was under high, nervous strain and mental excitement engendered by impositions amounting to fraud practiced upon her at the time by the parties seeking her endorsement, including the agent of the defendant and the attorney H. Paul Jones.

Upon the trial, the plaintiff introduced, over defendant's objections, a copy of the certificate of the death of the deceased Andrew J. Muller made by Robert E. Niederer, deputy coroner of Mason County, Illinois, and certified by Frank J. Jirka, director of public health for the state of Illinois, together with a copy of the laws of Illinois providing for the registration of births and deaths throughout the state and related questions, including the requirements for a certificate of death by the last attending physician where there is one or by the coroner when properly referred to him.

So far as is disclosed by the record, nothing occurred to the deceased that might have occasioned the injuries, other than the accident of April 8 and the accident of May 23. There was no evidence that he died from any disease or that any disease contributed to his death.

The suit is for the balance of $1250, due under the policy after crediting the amount thereof with the sum of $750 paid by the draft of July 14, as before noted, for which balance plaintiff made demand upon defendant prior to the bringing of this suit and payment of which was refused by defendant. Plaintiff made due proof of death under the policy in accordance with requirements contained therein and of all other matters required.

At the close of plaintiff's case, the defendant requested a peremptory instruction to the jury directing a verdict for it, which the court refused to grant. The defendant thereupon introduced its evidence and, at the close thereof and of the whole case, prayed an instruction in the nature of a demurrer to the whole evidence directing a verdict for it, designated in the record as Instruction B, which the court refused. The jury, upon the cause being submitted to it, returned a verdict for the plaintiff for the sum of $1250, the balance due upon the policy, the court having refused to submit the question of vexatious delay and of liability for attorneys' fees. Judgment in favor of the plaintiff for $1250 being rendered in accordance with the verdict, the defendant filed its motion for a new trial and, likewise, its motion in arrest of judgment, within the time required by law. Said motion for a new trial being overruled at the June term, 1933 of the court, the motion in arrest of judgment was heard at the

same term and was by the court overruled. Thereafter, during the same term of court, defendant filed application for an appeal; and an order was made, at such term, upon such application, granting an appeal from the judgment rendered to this court.

## OPINION.

1. The defendant upon this appeal contends that the court below committed error upon the trial in refusing to give Instruction B asked by it in the nature of a demurrer offered at the close of all of the evidence in the case and assigns as a reason therefor that the evidence of the witnesses upon the trial fails to show any causal connection between the accidents in which he was involved and his death and because the death certificate produced in evidence was not prima facie evidence that the statements contained therein were true and, therefore, furnished no evidence from which such casual connection could be made to appear—in other words, that there was no causal connection between such accidents or either of them and the death of the deceased shown by any competent evidence in the case.

It must be conceded that the burden of proof is primarily upon the plaintiff, not only to show an accident to the deceased and his death but to show a causal connection between such accident and his death in order to make out a case for the jury. [Warner v. St. Louis & M. R. Ry. Co., 178 Mo. 125, l. c. 133-134; Boten v. Sheffield Ice Co., 166 S. W., l. c. 883.] We cannot agree with the contention of the defendant that such causal connection in this case between the accidents shown and the death of the deceased is not shown by the oral evidence of the witnesses upon the trial. On the other hand, regardless of the certificate of death introduced, the oral evidence of the witnesses upon the trial is sufficient to establish such connection. There is no evidence that deceased came to his death by reason of any disease or that his death was contributed to by disease of any character. The evidence of his physician, Dr. W. A. Steele, shows that, prior to April 8, the deceased was a man of fairly good health and that, prior to such time, he had been called upon to treat him for only minor matters of no importance; that, on the eighth day of April, he examined him and found him suffering at that time from a strained and overdone heart. There is nothing up to that time, so far as the record discloses, that had happened to him from which such condition might have been brought about other than the injury received from the falling stove. That this condition of the heart was not a chronic condition is an inference to be drawn from the doctor's testimony, in that, in a short time, he made rapid recovery from such condition and was much improved when, on or about the twenty-third day of May, 1932, he accidental-

ly fell into a well and struck his breast, about the same place as where the stove fell upon it, upon a large log lying across the opening of the well. Nothing happened to him between the eighth day of April and the twenty-third day of May—the date upon which he suffered the second accident—through which the injuries from which he evidently died might have been occasioned. Upon this second accident, he was completely disabled and unable to extricate himself from the well into which he had fallen. He was rescued therefrom by the efforts of his wife, the plaintiff herein, and taken into the house and placed upon the bed. He died on the twenty-ninth day of May following without ever having been able to get off of the bed. Upon cross-examination, the plaintiff said that he had never got off of the bed; that, in his condition, he could not have got off; but that he might have exerted and moved his body in an effort to get off.

It is true that there was no visible evidence upon the outside of the body, such as marks, abrasions, and wounds, tending to indicate that he had been injured; but there was ample evidence from which an inference might have been drawn that he had been seriously injured on each of said occasions.

Upon his death, an autopsy was held; an incision was made into his breast; four ribs above the heart were found completely separated, together with a puncture occasioned by one of them digging into the heart. The broken ribs together with the puncture, in the opinion of the physicians making the autopsy, were sufficient to and did cause his death. Just when this puncture occurred is not definitely shown by the evidence. The physicians who held the autopsy testified that, in their opinion, death would follow soon after such a puncture. In the light of the evidence in the record, just when the ribs were broken apart and separated cannot be told with certainty. However, from the testimony of the doctors, the puncture must have occurred after the complete separation and shortly before the death of the deceased, as the puncture was occasioned by one of the broken ribs digging into the heart. The ribs may have been injured in the first accident. It may have required the second to separate them completely; the puncture was not necessarily made at the time of the complete separation. It may have happened afterwards. This could have been brought about by the movements of the body after the complete separation and prior to his death, in efforts to change his position in the bed or in his efforts to get up. The rupture may have been small in the first instance, or it may have been large, and the quickness with which death might follow upon the rupture might have depended upon the size of the puncture and the amount of blood escaping through the same, so that the mere fact that the doctors testified that his death would ordinarily

follow quickly upon such an injury as they found does not negative the idea that the deceased's death was occasioned by such accident because such accident happened some three or four days prior to his death. The evidence is ample, in our opinion, to find that the cause of his death was the accidental puncturing of his heart by the broken ribs, accidentally received by him upon the occasion when he accidentally fell into the well, and that the accidental puncturing of the heart was induced by and resulted directly from such accidental falling into the well and the injuries accidentally occasioned thereby and following therefrom. There is no evidence that the condition of his body subsequent to his death was in any way different from what it was prior to his death. That Dr. Steele, in his examination from the outside, found no indication of the broken ribs and the punctured heart on the inside is not conclusive that they were not there prior to his death. The same condition existed after his death, and there were then no outward conditions to indicate the broken ribs and punctured heart on the inside. The fact that the deceased had a large and prominent breast, one that bulged out, may have prevented the physician from detecting by an outside examination the existence of the broken ribs and punctured heart on the inside. There is no evidence anywhere, other than of a merely speculative nature, that his condition was brought about by an application of some force after his death.

2. The contention that the oral evidence of the witnesses upon the trial failed to show any causal connection between the accidents in which the deceased was involved and his death must be ruled against the defendant. Whether or not the certificate of death furnished prima facie evidence of such causal connection, therefore, becomes immaterial. Besides, such certificate, as hereinafter found, for the reasons hereinafter stated, was erroneously admitted in evidence. The error thereby committed, however, was harmless and not prejudicial. There was ample evidence of the causal connection between the accidental injuries received by deceased and his death without the certificate, and neither the verdict of the jury nor the judgment of the court rendered thereon is made to depend upon it. [Simpson v. Wells, 292 Mo. 301, l. c. 323.] From the conclusions announced, it follows that the court did not commit error in refusing defendant's requested Instruction B.

3. It is next contended by appellant that the court below erred in giving Instruction Number 1 in behalf of the plaintiff, submitting the question of whether the paper in evidence, purporting to be a release of plaintiff's claim, was, in fact, signed and executed by plaintiff, for the reason that the execution of said release by plaintiff had been tendered by defendant's amended answer and a copy thereof annexed to said answer and filed therewith, duly verified

506

as provided by Section 815, Revised Statutes 1929, and that the execution of the same stood confessed by reason of plaintiff's failure to verify her amended reply to defendant's amended answer denying its execution. The cause, however, proceeded throughout the trial upon the theory that the amended reply unverified was sufficient to tender the issue that plaintiff had not executed such release. No objection, so far as the record discloses, was made by defendant upon the trial to its sufficiency. No motion for judgment upon the pleadings was made or other steps taken by defendant by which any advantage was sought to be had of plaintiff's failure to verify her amended reply. There was no objection to any evidence upon plaintiff's part upon the trial tending to show that she had not executed such release or authorized its execution by any one or acknowledged its execution or that her signature thereto was not genuine or not made by her. No specification of want of verification was made in the motion for a new trial or in the motion in arrest of judgment. · Under such circumstances, it is now too late to raise the question presented by defendant's contention under this head. [The Beck l& Pouli Lithographing Co. v. Obert, 54 Mo. App. 240; Wilcox et ux. v. Sovereign Camp Woodmen of the World, 76 Mo. App. 573; Kelly v. Thuey, 143 Mo. 422, 45 S. W. 300; Handley v. Chicago, R. I. & P. Ry. Co., 55 Mo. App. 499, 1. c. 505.]

The case of Hahs v. Railroad, 147 Mo. App. 262, cited by appellant under this head, has no application here for the reason that in such case the defendant objected upon the trial to the introduction of any evidence for the reason that the plaintiff had failed to file a verified reply denying the release set up by it in its answer. Likewise, in the case of Hannah v. Butts, 51 S. W. (2d) 4, 1. c. 6-7, cited by defendant, the defendant moved for judgment upon the pleadings based upon the fact that the plaintiff had failed to file a verified reply to his answer pleading a release; and, for such reason, it has no application here. This contention must, therefore, be ruled against defendant.

4. Defendant next contends that the court below erred in giving Instruction Number 2 for the plaintiff, assigning as its first ground for such contention that, under the evidence, no fraud was shown to have been perpetrated on the plaintiff by defendant in the settlement of her claim and, therefore, such instruction should not have been given.

The facts hypothecated to the jury for its finding had the support of evidence in the record and, if found by the jury to be true, were sufficient to justify the jury in finding that the acceptance and endorsement of the draft by plaintiff were not, under the circumstances shown, a settlement and release of her claim by reason of fraud practiced upon her by defendant in connection with others

in the procurement of such endorsement. We find no error in the instruction in this regard, and appellant's assignment must be denied.

5. Appellant's third assignment under its contention that the court committed error in the giving of Instruction Number 2 is that, under the evidence, such instruction failed to declare the law of the case. This assignment seems to be based upon the contention that plaintiff, having endorsed the draft in question without first reading it herself or having some one read it for her, was guilty of such negligence as to estop her from avoiding it on the ground that she was ignorant of its contents. She refused to sign it. She was sick and nervous. She was jerked from her chair four times by H. Paul Jones, who was demanding that she make the endorsement; and, finally, she signed it. There is ample evidence in the record tending to show that the defendant, a number of times, requested to see the draft and that Mrs. Ramsey asked that she be permitted to read it to her before she affixed her endorsement but that the parties seeking the procurement of her endorsement—among whom was defendant's agent—refused to allow her to see it or to allow it to be read to her but peremptorily demanded of her her endorsement of the same while it was held face down on the table near her with the hand of H. Paul Jones at all times upon it. It was stated to her by such parties that, if she did not endorse it, she would get nothing and that the undertaker, Niederer, would get it all. She was led to believe from their statements that the draft was a mere advancement upon the amount due on the policy, a part of which was to be used in paying Niederer, the undertaker, for the burial expenses of her deceased husband. It was never told her that it was in full settlement of the policy, or that, if she endorsed it, it would be all she would get. She knew nothing about the draft until it was brought to her by the agent of the company and by one H. Paul Jones who, it transpires, was named as one of the payees thereon and described as her attorney. She had never been consulted about it. She had never discussed any settlement of the policy and had never had any controversy with defendant or its agents respecting the payment of the full amount thereof, other than a claim by defendant that she had assigned the full policy to Niederer, the undertaker, and that she could not collect it, which she denied. She had never assigned the policy to Niederer or other persons and had never authorized any one to settle or compromise the policy. She had never authorized the undertaker or H. Paul Jones or other person to make any compromise or settlement of the policy. H. Paul Jones was not her attorney and had no authority whatever in the premises to act for or bind her. She had never heard of any negotiations for

a settlement or of any proposition for one. So far as the record shows, the alleged settlement and draft were wholly arranged by other interested parties and presented to her for her endorsement without ever having consulted her. The contents of said draft, including the notations of settlement and payment in full of all claims thereon, were studiously concealed from her at the time she endorsed the same; and her request that she be permitted to see it and the request of Mrs. Ramsey that she be allowed to read it to her were denied. She was imposed upon by the attorney H. Paul Jones through his language, conduct, and brow-beating and overpowering manner at the time and became highly nervous and mentally excited by reason thereof and, while in that state of mind, so induced by the opposing parties, she finally endorsed it without knowing that it was other than represented to her to be, a mere advancement upon the $2,000 due under the policy which, in part, was to be used in paying funeral expenses of her deceased husband. She was coerced into her endorsement of the same by the language, conduct, and brow-beating and overpowering manner of the attorney, H. Paul Jones, toward her—with whom..the agent was acting—and his peremptory demands that she do so and by the language of said agent. It was not her voluntary act. There is ample evidence in the case, some of which it is unnecessary to recite, to submit to the jury the question of fraud by defendant's agent, perpetrated upon the plaintiff, in the procurement of her endorsement.

It is true that a person who is competent to contract is, ordinarily, presumed to know the contents of a contract he signs; and the fact that he does not read it or does not have it read to him before signing does not rebut the presumption. [International Text Book Company v. Anderson, 179 Mo. App. 631, l. c. 637.] It is only where fraud, accident, or mistake intervenes that one may be relieved under such circumstances. In the absence of fraud, accident, or mistake appearing, the law concludes the matter in accord with the terms of the writing that the party has signed; for, if he can read, he must do so; and, if not, then it devolves upon him to have another read or explain it to him. [Same authority supra.] In the case of Zeilman v. Central Mutual Insurance Association, 22 S. W. (2d) 88, l. c. 92, decided by this court, the same doctrine was announced. Judge BLAND, in his opinion in this case, says, "It is well settled that where a person cannot read it is ordinarily as much his duty to procure some person to read or explain the contents or writing to him before he signs it as it would be to read it before he signs it if he were abled to do so. Failure to obtain such a reading of the contract, or explanation of it by some one upon whom he has a right to reply, constitutes such gross negligence as will

estop him from avoiding it on the ground that he was ignorant of its contents.''

He further quotes approvingly from the case of Hall v. Kansas City Southern Railway Company, 209 S. W. 582, l. c. 584, also decided by this court, as follows:

''The general rule is that parties to written contracts are not permitted to go behind the writing. This rule, however, does not obtain where one of the parties while acting as an ordinarily careful and prudent man in his situation would act, nevertheless, is misled by some fraud of the other party. To make a case under the exception to the rule two things are indispensable: (1) Fraud in the procurement of the contract practiced by one party; (2) ordinary care and prudence exercised by the other.''

The Zeilman case, supra, was well ruled upon the facts therein. Where a party blindly signs a contract, voluntarily, without reading it or having it read and without being induced wrongfully and fraudulently to do so by the opposing party, the law will hold him thereto. In this case, the facts bring it within the exception to the rule as announced in International Text Book Company v. Anderson, supra, and in Hall v. Kansas City Southern Railway Company, supra, and in the Zeilman case, supra, and numerous others. There is evidence, as hereinbefore indicated, from which it may be sufficiently found that fraud was practiced upon plaintiff by the opposing parties in procuring her endorsement. The draft and proposed settlement were arranged without her knowledge, and her acceptance and endorsement were fraudulently imposed upon her. One of the payees therein was a person named as her attorney when he occupied no such relationship; another was the undertaker who claimed under an assignment which plaintiff denied having made. The draft was presented to her for her endorsement, which endorsement was wrongfully and fraudulently procured in the manner and by the methods and means above indicated. The defendant should not be permitted to take advantage of its own wrongful and fraudulent conduct. Plaintiff asked that she be allowed to see the draft before signing; and Mrs. Ramsey asked that she be permitted to read it to her; both requests were arbitrarily refused.

In the case of Anderson v. Meyer Bros. Drug Co., 149 Mo. App. 554, 130 S. W. 829, it is said, ''It is trite law that a person is expected to learn what an instrument contains before he signs it, either by reading or having it read, or by having its contents stated by some one on whom he has a right to rely, the circumstances considered, and provided either method of obtaining information is available—'' Here, neither method was available. That she be permitted to see it or that it be allowed to be read to her was re-

510

fused by the opposing parties. They were asked to wait until the head of the house came which they refused, although it was the dinner hour and he was expected in a few minutes. The evidence is pregnant with facts showing that the plaintiff's endorsement of this draft was procured by studied and flagrant fraud practiced upon her and that an outrageous advantage was taken of her. To hold that, under the circumstances of this case as shown by the record, the plaintiff cannot avoid her endorsement of the draft because she made it without first reading the draft (when she was refused to be permitted to see it) or without having it read to her (when it was asked and its reading refused) would be a condonement of the fraud practiced upon her, which the law ought not permit. Defendant's contention under this head is, therefore, denied.

6. It is finally contended by defendant that the court committed error in admitting in evidence the death certificate issued by the coroner of Mason County, Illinois, signed Edward H. Niederer, coroner, by Robert E. Niederer, deputy coroner, for the reason that it was hearsay. The laws of Illinois, so far as shown in the record, require that the medical certificate shall be made and signed by the legally qualified physician, if any, last in attendance upon the deceased or by the coroner; that, in case of any death occurring without medical attendance, the coroner shall be notified by the undertaker and shall thereupon proceed in accordance with the provisions of section 10 of an act to revise the laws in relation to coroners. The provisions of section 10 of such act are not shown by anything in the record.

In this case, it sufficiently appears that deceased had an attending physician from and after his accident of April 8, 1932, to the time of his death, one Dr. W. A. Steele. He was not present at the time of the death of the deceased but had seen him a short time prior thereto and called immediately after. No explanation is given as to why he did not take the medical certificate or as to how the coroner succeeded to any jurisdiction in the matter other than a request by plaintiff that an inquest be held. If such a request by plaintiff was sufficient to relieve the attending physician of the requirements imposed upon him by the law and the assumption of the same by the coroner, it is not disclosed by the record. That the coroner was a physician does not appear, and neither does it appear that his deputy was a physician. It is not shown that Dr. Steele notified the coroner for any reason to take charge of the body and hold an inquest, although it does appear that Dr. Steele was called by the coroner to assist in the autopsy. It is shown that the undertaker is authorized to notify the coroner of the death and the coroner is thereupon authorized to take charge of the body in

cases where the deceased died without medical attention. It is not shown that he is so authorized otherwise. No authority is, therefore, shown for the action of the coroner in this case; the statements contained in the certificate amounted to mere hearsay, as far as proof is concerned. The court erred in admitting it in evidence. It has been held by the Supreme Court of Missouri in the case of O'Donnell v. Wells, 21 S. W. (2d) 762, l. c. 765, arising under the laws of Missouri and involving similar questions and facts, that a certificate of death issued by the coroner or his deputy instead of by the last attending physician of a deceased person is unauthorized and not admissible in evidence under statutes with respect to like subject-matter and with like provisions and requirements as the Illinois statutes involved herein. However, the error committed by the court in this case was, upon the whole record, harmless and not prejudicial. [Simpson v. Wells, supra.] There was ample evidence in the record as to the death of the insured, the accidental manner, means, and causes by which it directly came about, independently of all causes, without such evidence as might have been afforded by the certificate. There was no substantial evidence of death from other causes. Neither the verdict nor the judgment rendered thereon is made to depend upon said certificate. The judgment was for the right party and has ample, competent evidence for its support. We find no prejudicial error upon the trial with respect to any of the matters complained of. The judgment is affirmed. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of REYNOLDS, C., is adopted as the opinion of the court. The judgment is affirmed. All concur.